May it please the Court, Michael Carvin for Appellants. In this case, Alameda has enacted an unprecedented first-in-the-nation law which directly regulates out-of-county producers, directly burdens interstate commerce, solely to secure local economic advantage. They regulate my clients... Well, Counsel, when you say solely to secure economic advantage, can you help me with that? Of course, opposing... You've read the briefs, of course, many times. They cite several other reasons, several reasons regarding public safety. Could you address that? Sure. Obviously, the law is intended to do take-back programs, and that serves an environmental purpose, and we don't in any way dispute that. But the law, for example, in D-Milk was pasteurizing milk, and that serves a very valid purpose. But the question that the Supreme Court asked was, well, what about this part of the provision that limits interstate commerce, this five-mile restriction? And what we're asking here, and what they need to justify here separately, is the decision not to conduct the take-back program, but to shift the cost to interstate producers. In other words... Well, but I don't know whether it shifts the cost to interstate producers. It shifts the cost to all producers, doesn't it? Yes. I mean, it just so happens the majority are out-of-state, but if you're in-state, you're going to get the cost nonetheless. Well, of course, as a factual answer, there's only two of the relatively hundred that have a presence in Alameda. I understand that. But my legal point, Your Honor, would be that they don't tie it to having any preexisting physical presence in Alameda. They tie it to having one of your medicines in Alameda. Well, don't they tie it to selling the medicine? Distributing, yes. Right. So why does it matter where it's produced? It only matters in the sense that they are not regulating the product. They are regulating the producers. In other words, they're not – in all of these other cases, they're saying that there's some harm relative to the product, that this product poses a danger or misleads consumers. There's no allegation here that anything we have done in our production or distribution activity in any way poses a threat to consumers. It's only... Well, it's not in the sense of being culpable, certainly, but isn't the problem that there is – there are public safety issues inherent in the product? You mentioned environmental concerns a minute ago, but there are other concerns that the county raised as well, right? Right. Poisoning of children and whatnot. And I don't mean to suggest for a minute any culpability, but I am trying to get back to the point about the county's got these concerns, right, which they all articulated. And I'm not sure how this applies unevenly, which is really Judge Smith's point. Well, whether or not it's discriminatory, the point is that they are directly regulating us, okay? Yes. What are the two kinds of regulations they're doing? They're telling people that have never been in Alameda before that they've got to establish a physical presence in Alameda for the first time. Are they? Yes, because they're saying... Why is it necessary to establish a physical presence as opposed to financing this activity? Well, because the ordinance says we need to operate a take-back program, the producers. It's their responsibility. It says you can do this through agents, but of course... Right. And that wouldn't be a physical presence, right? Well, no, I think under any kind of due process or normal law, if my agent, my salesman, my agent comes into a jurisdiction, it establishes a physical presence for the principal. It's a basic principle of law that I am responsible for my agent's activities. If it were otherwise, then corporations could always get around everything by simply designating their agents and pretending they're somebody else. No, the ordinance is quite explicit. That is the producer's responsibility to operate these laws. And the other thing it does is not only require us to establish a physical presence in Alameda, but to get into an entirely different business. We are pharmaceutical producers, and they are asking us to become waste disposal experts. Under this theory, they could require any person who sells beer in Alameda to establish a brewery or a recycling plant, any farmer to establish local garbage collection. And I thought that the Supreme Court cases have made it quite clear that requiring or inducing companies to come into the local jurisdiction is per se forbidden. Carbone, Dean Milk, the Pike per se case. In each one of those cases, the Supreme Court struck down laws which simply induced you to contract with a local company or to relocate your existing business into the locality. And in this case, it goes much further. It not only induces us to contract with an agent, it mandates that we do so. It not only mandates that we relocate our existing business into Alameda, it makes us get into an entirely new business. So the analogy to the Supreme Court cases would be if in Carbone, instead of saying deal with a local garbaging processor, they said everyone who produces something that becomes garbage in the locale must establish a garbage processing plant. Pike, I think this bears very close reading. They struck down as a per se prohibition in Pike the requirement that people who grow cantaloupes in Arizona put them in containers in Arizona. And here, and that was struck down because it was requiring you to do business in the enacting jurisdiction. What here would be like is if they had made cantaloupe growers pick up discarded cantaloupe. So this is far worse than all of the cases that the Court has struck down on the grounds of inducing people to come into local jurisdictions. And why is the Supreme Court so insistent that you not do that? Because, of course, as we know, the Commerce Clause is designed to end this balkanization, this requirement that each locality can induce people to make the most basic decisions about where they do business, what kind of businesses they're in. They are commandeering those decisions by us simply because of the presence of one of our medicines in Alameda. This creates enormous burdens on the interstate flow of goods because now before you make a decision to produce a certain product, your entry costs are not just how much does it cost to produce and sell the product. You have to ask yourself how much will it cost me to pick up this product when it's disposed of in each of the country's 3,000 counties. So what we've got is increased burdens on the interstate flow of goods designed with geographic barriers. So that, it seems to me, is the key thing. And, Your Honor, I think what distinguishes the cases that I've ---- I want to stop you just a little bit. It seems to me that I've got to apply brown form and distillers to this particular case. It seems to me that one can, if one directly regulates or discriminates against the interstate commerce, then I don't think I've got any trouble. I can strike that down. But if one only indirectly affects it, then I have to examine the burden. Now, when I looked at ---- and I want to take this up generally backwards maybe. When I look at the burden, I didn't see much burden evidence in the briefing or even in the record. It didn't seem to me that you were really talking about burden here. It seemed to me you kind of gave that up. The county said one type of cost. You said another. But nobody seemed to think that was very cost determinative. You provide no evidence that the ordinance is going to interrupt or even decrease the flow of goods into or out of the county. So I guess I'm having trouble about burden here if I get to the second part that this is only indirect. Okay. And I'll first deal with burden and then suggest why I think it's the direct burden. Well, I understand I've got to look at direct burden, and I think to some extent you were there before and I want to go there. But I'm trying to look at supposing I don't think it's direct. Fair enough, Your Honor. And to deal with that correctly, I don't think we've in any way minimized the burden. If we did, it's my mistake. We said it has cost a million dollars for startup costs, $1.2 million annual cost to conduct these take-back programs. And the county suggests that it's $330,000 annually, but don't really fight too much about the 1.1. But they also agree that we not only have to pay for our costs, we have to pay for their costs. And they estimated us paying for their regulation of us was $200,000. And, yes, I think $500,000 annually is, under any case law that you can look at, a severe burden. Well, where do I find that in your briefing? Because, frankly, I was really surprised that one really didn't take up the burden very much. That the best you, I mean, I didn't even see any evidence the ordinance would interrupt or even decrease the flow of goods to the county. Well, Your Honor, obviously if you increase But, of course, with $965 million in sales, maybe that wasn't such a good argument to make with only $1 million. Well, Your Honor, I really don't think there's a separate dormant commerce clause for wealthy industries. Well, I understand that. But to be fair, to get to Judge Smith's question, isn't it relative, counsel? No. The Supreme Court has made this absolutely clear. In Oregon waste, it was a $2.25 per ton burden, which the dissent calculated would cost them each about 14 cents per ton. In Alabama chemical waste, it was $72 per ton. But I'm not talking about per ton. I'm wanting you to compare, if you would, the burden, meaning let's take your numbers. It was $1.2 million versus the total sales in Alameda. That's what Judge Smith is suggesting. Is that wrong? Is that the wrong measure? I'm sorry. The right number is $1.2 million. If everything goes swimmingly, annual cost of $200,000. So it's $1.4 million annually. There's not a case in the United States. You're not answering the question. Maybe it's because I'm not asking a good one. But isn't the comparison when we talk about burden, whatever the cost of this recycling program is going to be, 1 point, if you want, 1.4 million, compared to the sales in Alameda County? Oh, compared to the sales. No. No one has ever looked at it in relative terms. Think about it this way. If you put a tariff on a popular good, you don't say, gee, there's a whole lot of goods being sold. So even though it's only a $2 tariff, you're selling a lot of goods. The question is whether or not you would increase the relative cost and whether those would be shifted to consumers. What Judge Smith is trying to get you to answer, and if he's not, I am, is why is this cost that you're using your numbers, why is that a significant burden? It's a burden because it's a direct burden, just like a tariff is a direct burden. And no one – the Supreme Court has made it clear that there's no de minimis exception. The Supreme Court has also made it clear, and I think this is an essential point that you don't just look at the costs in one county. There are 3,000 counties in the United States. If you want – if this Court upholds this statute, what county is not going to go for this deal? What county is not going to say, I can either charge a lot of out-of-state pharmaceutical companies or I can charge the taxpayers who are going to reelect me next time for this kind of waste disposal? And there's no reason to limit to pharmaceuticals. Why couldn't they shift all the costs for normal garbage collection or recycling to a lot of out-of-state California firms? All right, since we're going to talk about tariffs, how is this ordinance anything like a tariff? Well, the reason – I mean, as the Supreme Court explained in Westland Creamery, a tariff violates the Dormant Commerce Clause because it simultaneously benefits local producers by burdening their out-of-state producers.  Well, there's two points, Your Honor. One is, under this Court's case law, you look at the practical effect rather than what the statute says on its face under S.D. Myers. And the practical effect is the only goods that are burdened here come 100 percent from out-of-county. So it is no different than a law that said, we will charge you this amount if you deliver the goods. They don't come 100 percent from out-of-town, though. I thought we established that. Three million of the 985 million is – or, excuse me, three billion – well, there's a percentage that's produced right in the county. No. That's not true, Your Honor. If you look at the stipulations, there's two manufacturers in Alameda that produce roughly 1 percent of it – 1 percent. But even they send it out to wholesalers before it's sent back in. So every one – every medicine here is delivered across county lines. But the main point I'm trying to make about tariffs is they seem to think it's okay to enhance their revenues by burdening out-of-state producers. And the paradigmatic evil in the Commerce Clause is setting up a tariff in New England and saying, we're going to put a tariff on cotton, and saying that they don't need to be protecting New England cotton growers because there are none, but it impedes the interstate flow of goods. And that's the point about a direct burden, a one-penny tariff. But, Counsel, you've just said it again. You've just done it again. Yeah. And I must be missing something, because the first questions we asked you to address is how does this burden out-of-state producers any differently? Because – It burdens all the producers, doesn't it? Again, 98 percent of them are out-of-state, and you look at the practical effect. But it applies to all of them, right? Yes. But the Court has made clear ample times that you don't only look at what it says on its face. You look at its practical effect. Okay. But more importantly, NCAA didn't have any discrimination in favor of local producers, but nonetheless, it affected – there was no analog in Nevada. NCAA affected their ability to conduct their interstate business. Let me – let me check you just a little bit on this. And I heard your first part of your argument. Even if I accept this part of your argument, that this ordinance somehow shifts the burden of running the government to out-of-state actors, how does it artificially encourage in-state production? Well, what it does is precisely – I mean, I didn't see that in your brief, and I'm having a tough time understanding it. Well, again, the way – not only artificially induces it, as in Pike and Carbone and Dean Milk, it requires us to come in and start engaging in waste disposal without any compensation. They had a take-back program. Now we are assuming the responsibility. So it doesn't artificially increase in-state production. It mandates in-state, in-county production by us of assuming a traditional governmental function. And the only reason they are doing this, their articulated purpose, was to shift the cost from the local taxpayers, who are responsible for and benefit from this program, to strangers who have absolutely no role in disposing of unused pharmaceuticals. So that's the point I'm really trying to convey here, is that they are exceeding their jurisdiction by dragooning us into Alameda, and they're exceeding their jurisdiction by making us take on their responsibilities. And we are not in any way suggesting that take-back programs don't serve what they think is a valuable purpose. We are suggesting they need to separately justify requiring us to do it. All of the cases in the indirect burden context that said, look, there's a product that's come into our jurisdiction. It creates some problems. We're going to tell you what to do. And that has an indirect effect on out-of-state producers. So if they came in and said, well, we're not going to require you to do it. We're just going to require you to pay us for us doing it. Would that be okay then? Well, then that would directly be a tariff. But what they could do, and what we encouraged them to do, was charge a special take-back fee. Every time one of our products is sold in an Alameda pharmacy where they have jurisdiction, they can impose a special take-back fee. It doesn't have to come out of general revenues. But why didn't they do that? Because then the people paying that would be local Alameda citizens rather than you. It's different my question, though. And I don't think it's a tariff if they said to you, you're going to pay for what we're going to do. You say that's a tariff. Well, A, it's that. And B, no, they can't make us donate to local charities if we have absolutely no connection with it. That's jurisdictional, and it's an economic problem. They can't tell people who's only contact with Alameda. There's an entire line of Supreme Court cases, Quill, Complete Audit, which say, look, this would greatly disrupt interstate commerce if local jurisdictions took a disproportionate share of the interstate income stream revenue, which is why we're going to severely limit local jurisdictions' ability to impose these taxes on people, both interstate and interstate, who are sending their products through interstate commerce. Why are they doing that? Because they are taking a disproportionate share of the national revenues for local economic advantage. And the reason that's – It'd only be disproportionate because other counties aren't doing the same thing, probably. The key thing is to understand it's fairly apportioned relative to the services that Alameda is giving us. Alameda is already imposing a normal sales tax on our pharmaceuticals. I'm saying that they could add a special take-back fee on top of that. But what they're doing is saying every time one of your medicines arrives, you're responsible for picking up everybody's medicines. You are responsible to come into Alameda and establish an entirely new line of business. That is not only a jurisdictional problem because they're reaching outside their borders. It creates precisely the kind of economic balkanization that they're worried about. Every county will do this. Every county will say, I can either charge the people who vote me back into office for the normal traditional municipal functions, or I can say a bunch of California wine growers or farmers are now going to be taxed for cleaning up cantaloupes and other garbage. It is precisely the kind of outsourcing and rent-seeking against the interstate market that the Commerce Clause was designed to prevent, A, because Congress has plenary jurisdiction over that interstate market, and B, because it creates all of these national barriers, barriers for national businesses to conduct in individual localities. What's your strongest argument that this is a barrier? Oh, well, I really, again, I think Carbone and Pike and Dean Milk say, look, you can't even induce us to come into a jurisdiction. You can't even require that if you grow cantaloupes in Arizona, you have to put them in containers. Well, not only are they inducing us to come into Alameda, they're making us come in through our agents or otherwise, and they're making us get into an entirely new line of business. So I think those are the strongest cases. In terms of extraterritorial cases, they stopped New York from saying you can't impose certain restrictions which have an effect on your existing business's prices in Connecticut. Well, isn't it far worse to say if you sell a bottle of beer in New York, you've now got to establish a brewery in New York, or you've got to establish a recycling plant. Wouldn't that have a far more profound inhibiting effect on the flow of goods than anything that was contained in those extraterritorial cases? One last example, NCAA. All they said was this might have a ripple effect on how you conduct your disciplinary proceedings in Oklahoma. Wouldn't it have been far worse if Novartis came in and said you need to establish supplemental educational programs in Nevada for student-athletes because you are responsible for this problem? Those are the analogies that work here, and they are far in excess of anything that the Supreme Court has condemned as a per se violation. Thank you. Thank you. Good morning, members of the court. My name is Arthur Shartzis. I represent Alameda County, and with the permission of the court, I'd like to briefly go through five or six items which were responded to and address what the law actually is and what the facts actually are. First, on the issue of direct control, Your Honor, I think you mentioned one of the direct control cases. What direct control or direct regulation or extraterritoriality means under the Constitution is when a jurisdiction issues a regulation that reaches outside of the jurisdiction and causes companies to be required to do things outside of the jurisdiction with their products. A good example is the price affirmation cases. The NCA, another good example, where Nevada's regulation would have required the NC2A to apply Nevada law in all the other states. The cases are clear on this. Healy, Brown-Forman, Baldwin, National Collegiate Athletic Association, Edgar V. Might, they all talk solely about reaching outside of the jurisdiction to require companies to do something outside the jurisdiction. So the argument that this is a direct regulation finds no support in any of the constitutional law of either the Supreme Court or the Ninth Circuit. The second issue that was raised, counsel suggested that the ordinance requires a company to come into the jurisdiction to operate a program. Actually, under Stipulation 3, which is in Record ER 82 to 87, all of the stipulations, provides two things. One is to come into the county to operate. The other is simply to subcontract, to write a check, and by writing a check to cause a recognized stewardship organization to operate within the county. And in that regard, the pharmaceutical industry itself has made the claim that it intends to come in and operate. And while counsel said that would be a $1.4 million a year charge, if the court will simply look at Stipulation 27, you'll see it's a $1.2 million charge, and that it includes the administrative fees of the county, not a very significant number against a billion dollars in sales. Is that the fair comparison, 1.2 or 1.4, versus almost a billion dollars in sales? Is that the right comparison? Yes, Your Honor. And in fact, under ST, ST Myers reduces this to cost. ST Myers talks about how you measure burden. Burden is not measured by the physical things of what you have to do, that is, hire some people or hire some agency to do work. ST Myers at 253 F. 3rd 471 says, while we do not require a dollar estimate of the effect the ordinance will have, the overall effect, we do require specific details as to how the costs of the ordinance burdened interstate commerce. And we have in the stipulations the costs of the ordinance, both Alameda's estimate, which is around $500,000 with the administrative fee, and the estimate of the industry, 1.2 million. That's the cost that must be measured against the benefit. So in one way, Your Honor, you can say, well, this is truly de minimis. It's one one-thousandth of the revenue that's received. But the measure has got to be against the benefit. The measure is not against the gross revenue. And so the measure that's required by PIKE is for the pharmaceutical industry to come in and prove that that one-plus-million-dollar burden overwhelms the benefit. And so what benefit do we measure it against? The benefit we measure against are the stipulated benefits of health, safety, and environment. And those benefits are the putative benefits, not the actual benefits. The cases are clear. We don't look at the actual benefits. We look at the putative benefits. And if we look again at the stipulations of what the putative benefits are, we're measuring one one-thousandth of the revenue generated by the sales against stipulation number two. The ordinance declares in Alameda County the public, particularly children and the elderly, are at significant and unnecessary risk of poisoning due to improper or careless disposal of prescription drugs and the illegal resale of prescription drugs, that the groundwater and drinking water are being contaminated by unwanted, leftover, or expired prescription drugs passing through the wastewater and treatment centers. But I think counsel acknowledged that in response to one of the very early questions that I asked him, that the county has cited these other concerns and he's conceded that point. Well, if he's conceded it, Your Honor, then he must prove that a million dollars on a billion-dollar sales substantially outweighs all of the putative benefits that I have just listed. Let me go over. It seems to me you're still addressing the direct regulation, if you will, of interstate commerce. And I try to emphasize what I thought was the direct regulation. But it seems to me that the plaintiff, even maybe not taking on direct regulation, argues four different arguments about that this is direct regulation. And the one that's most worrisome to me is that why should I not apply the dormant Commerce Clause tax cases to this ordinance? Well, Your Honor, first of all, I'm sorry. I was going to say, because it seems to me that all we're doing is we're putting a tax here. We might be doing it a little bit differently. But why shouldn't I just say I'm going to apply the dormant Commerce Clause tax case to this ordinance? And I don't know whether we can really find nexus in fairly apportioned. And so, therefore, I'm going to throw it out. Well, Your Honor, first, I would suggest, recognizing the Court has now raised this issue, it's not an issue that even PhRMA thinks should be raised. If not, we would have seen it in all the broad briefing. PhRMA has raised it. Well, I thought PhRMA did invite us to apply it, Blue Brief 58. Your Honor, there is one reference to Quill in these briefs, I believe. But given the nature, and I don't want to argue about the briefing, the nature of the briefing, I think it could fairly be said. I mean, I thought the Gray Brief, even at 26 Note 8, talked about it again. That's why I bring it up. Well, Your Honor, let me cite you to San Juan Telephone Company, San Juan Cellular, 967 F. 2nd, 683. It was the First Circuit. It's an opinion by Justice, now Justice Breyer, in which he distinguishes between tax and a fee. He says the classic tax is imposed by a legislature upon many or all citizens. It raises money contributed to a general fund and spent for the benefit of the entire community. The classic regulatory fee is imposed by an agency on those subject to its regulation. Your Honor, I think this clearly falls as a fee and not a tax. You could provide a tax analysis. But the essence of this issue here is the harm that comes to the county from the selling of the good. And this is an attempt, and I think that Pharma has conceded in its brief, that it's not a tax. This is not a broadside attack on EPR programs. This is an attack on their direct control argument. But not on EPR. Pharma itself is able to recover its costs in Alameda County if it so chooses. There is nothing that prohibits it from raising its prices and recovering its costs. Well, but just a minute. I thought that the regulation itself suggests that it can't raise its costs at the point where it enters the county. In other words, it's got to raise the costs for everybody in America, not just the county. Let me address that, Your Honor. And Pharma conceded this in the briefing below. There is a prohibition on a specific identified fee being charged on the sale. That is, when you get your receipt, you can't say, and one cent to cover the cost of EPR, of disposing of the product. There is no prohibition of any kind for Pharma to raise its prices. It's free to raise its prices in Alameda County, and there's nothing that requires it to raise its prices elsewhere. But more importantly, the whole argument of cost recovery really is incorrect, because the dormant Commerce Clause jurisprudence makes clear that the Commerce Clause is not concerned with profits. It's concerned with fairness. And the best example is Pharma v. Walsh. The case in Maine where, upheld by the Supreme Court, Maine could require pharmaceutical companies, all of whom were located outside of Maine, to provide rebates to people buying certain drugs. Now, there's no way to recover that cost. You can't raise your price to recover a rebate. So in terms of being burdened with a cost, there was a burden. There is always a burden in any kind of regulatory activity, as regulations do. They have burdens. So the existence of the burden isn't the standard. The question is, does the burden outweigh the benefit, Your Honor? Let me go to one point, a few points that were raised to make clear. There was an argument about the Oregon waste case on the de minimis issue, right, that the Constitution, there is no de minimis. Well, the Oregon waste case is a discrimination case, as are the other cases. If you charged one penny more for an outside producer as compared to a producer in the jurisdiction, it would be jurisdiction. Those cases flatly don't apply to this question of de minimis. You always have to have a cost in a regulation, and you must always be measuring that cost. It's certainly not a tariff. Wes Lynn, Your Honor, says a tariff is when you charge people outside the jurisdiction of tax, but you don't charge people inside the jurisdiction of tax. And to lay to rest completely the issue of discrimination entirely, it doesn't matter where these companies are located. They could all be located in the county. They could all be located out of the county. It could be half and half. And the test comes down from Pharma v. Walsh, a very simple and very intelligent test. And Pharma v. Walsh teaches us this concept. If some company outside the county or the state moved into the county or the state, if it could get a better deal, if it could be better situated, then we have discrimination. But we have companies in the county right now. They're treated exactly the same as the companies outside the county in terms of this regulation. What do I do with the counsel's argument about this ordinance shifts the burden of running the government to out-of-state actors that it artificially encourages in-state production? You know, I have trouble understanding the in-state production argument. I just don't understand it. I mean, this is something that's a one one-thousandth of the profits that gets burdened on both in-state producers and out-of-state producers. It could only, I guess, promote in-state producers. I thought that what he was really saying, it forces us to come in and start a company to try to take care of this problem. Absolutely not. You just write a check. Well, his argument then, when I asked him that question, is that that would just mean that we're having our agent perform this function. What's your response to that? Well, under the statute, they can elect to do one of two things. They can either just write a check or they can come in. The law of United States v. Salerno, as cited by S.T. Myers, says, a plaintiff making a facial challenge to a local ordinance must meet a high burden of proof and must establish that no set of circumstances exists under which the ordinance would be valid. The fact that the ordinance might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid. So if the argument is having to come in and set up a company makes it invalid, writing a check does not. And I don't believe that having to come in and hire some people to pick up these pharmaceuticals creates a problem because of what I quoted from S.T. Myers earlier. It's all measured by costs. The costs are stipulated, too. They're arguing some kind of burden, but in the end, the cost is one one-thousandth of their revenue or less, since the revenues probably have gone up since 2010 when we had that number. That's how the measure works. And that's why S.T. Myers talks in terms of cost, because costs are the great equalizer in terms of regulation. Inevitably, for these companies, there's a cost. And the concept of this cost is that these problems are embedded by the manufacturers in the products. They're chemicals. They're embedded by the manufacturers. Well, they're inherent in the product, is what you're saying. There's not a culpability factor. No, no, no. That's not what you intend to be saying. No, no, no. Pharmaceuticals, if properly used, are a good thing. And nobody's going to dispute that. It would be crazy to dispute that. But the nature of the product itself has embedded in it some problems. The nature of tires, the nature of paint, the nature of mercury-based products, the nature of pesticides, the nature of carpet with those thick backings, there is just a disposal problem embedded in that. And in the United States, as we know from one of the amicus briefs on our side, there are now 70 programs in the United States that say, let's leave the costs with the people who created them. And they will eventually find a way to charge those costs so the contract between the manufacturer and the customer is complete. It covers all the costs of manufacturing, of shipping, of labeling, of advertising, and of disposal. And that really is the future. And that is something that governments as laboratories, as the Supreme Court, as Justice Brandeis, I believe, said, as laboratories of government are developing. The world's changing. Goods, when we wrote the Constitution, were paper, metal, animal parts, right? Now there are things they could have never dreamed of that are included in products, some dangerous, some not. And government is addressing the problems through this very direct leaving the costs with the manufacturers. And that's all this program is. You elect to sell the product in the county. You take responsibility for the aftermath of what's embedded in the product. It's not going to affect cantaloupes. It's not going to affect tomatoes. There's nothing inherently dangerous about that. There's no health problem. There's no safety problem. A few products are like this, and those products will get measured under the Pike test. Courts like this will look at claims that the regulation of some product is burdensome, and they'll make a decision on it. In this case, it's very clear under the Pike rule, which is the putative benefits overwhelmingly outweigh the burden. Or to put it differently, the plaintiff can't meet the plaintiff's burden here to prove that the burden is so much greater than the putative benefit to the county. That's what this law is. It's the laboratory of local government doing what the Constitution contemplated, and that's what this statute is. I think I have addressed all the issues, I believe. Maybe I should address balkanization, just as a last one. There's nothing here that balkanizes commerce. If Alameda County, if the court upholds the ordinance, Alameda goes forward, promulgates its ordinance, no state or county, not Los Angeles, not Nevada, not Idaho, none of those places are going to retaliate against Alameda County. They're not going to put up barriers to Alameda County. They're not going to make it harder for Alameda County businesses to do business in Idaho or South Dakota or Alaska. That's what balkanization is. What the Commerce Clause did was try to unify the union. It was essential to the Constitution. It was a failure of the Continental Congress. So when they wrote the Constitution, they wanted to be sure there weren't barriers between the states. So one state that sold tobacco couldn't keep another state's tobacco from being sold there. That's what the Commerce Clause does. This does not violate the Commerce Clause in any possible way. It's not extraterritorial. It's not control of commerce outside of the borders of Alameda County. It certainly is not discriminatory. And it leaves us only with the Pike balancing test. And there I would submit that the pharmaceutical industry has completely failed to show how the de minimis burden, the $1.00 and $1,000 charge, outweighs the punitive benefits of the case. I have a question. And I realize there's a severability clause in the ordinance that was passed. But, you know, there's a provision that kiosks, specifically targeting controlled substances, must be provided if a county law enforcement agency agrees to provide space for such kiosks, 650-3050-A11. And then there's another provision that deals with that, too. And it seems like that is a police function. And if you talk about controlled substances, you know, leftover things from a math lab or something like that, that isn't something that the pharmaceuticals That's what we're talking about here. This is pharmaceutical goods sold at pharmacies that are bought by individuals. That's the focus. Right now I can tell you that the police stations in Alameda County actually collect hazardous materials. So people can drop off things there. There's a separate program which deals with hospitals. That's in place. This is really the consumer side of all of that. All right. So, I mean, there are different ways these things are dealt with. But this is something that's just lacking in the county and that needs to be done. Opposing counsel's position is in the briefing they say repeatedly that it's not lacking in the county. It's just that they're wanting your this is a cost-shifting measure. Do you want to respond to that? Sure, Your Honor. There's no evidence that the county is doing this program. This is an expansive program. And, in fact, the pharmaceutical companies have to submit a program which is approved under the regulations. So to say the county's already doing it, we don't even know what the final program will be. But the county doesn't do it. There are a number of kiosks that are maintained by the county, and I can advise the court that, and there's a reference to 28 of them, four of them are run by Alameda County. The rest are run on a voluntary basis by others, but not the county. So that program doesn't exist. Thank you. Thank you for your argument, Counselor. Thank you, Your Honor. We'll hear again from you, Mr. Carvin. May I briefly make four points? In terms of the taxes, the Breyer opinion cited has in no way undermines Quill and Complete Auto, which say whatever the label is, you can't take a disproportionate share of interstate revenue, which they have clearly done, and the county doesn't even dispute that. On page 4, ER 68, Your Honor, it says that these product stewardship programs act as agents on behalf of each producer, which is the same thing it says in the stipulation cited by my opponent. In terms of Pike, please read that case carefully. Why are the benefits excessive relative to the cost? The costs are there. They could accomplish precisely the same thing without making producers responsible and continue their 28 kiosk program, so it doesn't produce any environmental benefit. But the key part of Pike is it says if you could do it in a way that has less of an impact on interstate commerce, that shows that it's excessive. There is a way to do it with less of an impact on interstate commerce, the way that every other county in the United States does it, through local garbage collection or special government-run programs. And the application of that in Pike was they couldn't make a California, an Arizona grower with a California container package system move the container package system to Arizona. Here they are requiring us to, again, establish a physical presence in this. In terms of your question about controlled substances, many of my clients' products are OxyContin, all kinds of controlled substances. They are asking that we establish kiosks where people come in and put these very dangerous drugs, where we have to have 24-hour guards, incredible liability from the DEA in terms of sorting this all out. This is not collecting bottles or collecting garbage. This imposes us to very serious responsibilities and liabilities, which is another burden on us. Well, I think I've given you an extra two-and-a-half minutes, frankly, unless there's some other point. I just wanted you to be able to respond to the points made because we're really looking at whether this really is direct regulation. And it seems to me that you made an argument about that, and I tried to put you on notice as to the things that were concerning to me. If it's not direct regulation, then it's indirect regulation, or you're suggesting, and then we're going with burdens. And it seems to me you've both responded to that, and I think you've tried to respond to his arguments. Is there anything further? May I have 30 seconds? Well, I mean, I'm giving you $250. I wanted to answer your question about the point of sale fees, just that it does increase costs, and it doesn't matter if those costs can be recovered from local consumers just like a tariff can. All right. That was the only point I wanted to make. Thank you. Thank you. Very interesting case. Very interesting case. And, frankly, I thank both of you for your arguments to help us make a very interesting decision, I expect. I don't know that it will stop with us. It's kind of like other decisions I've made on this Court. I don't know whether we're the last verse or we're just one verse among when we go to the big boys. But we thank you for giving us this opportunity. Appreciate it. Court is adjourned.
judges: Piersol, SMITH, CHRISTEN